UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CATHY M., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:20-cv-01637-TWP-DLP |
| ) | |
| KILOLO KIJAKAZI, Acting Commissioner of the ) | |
| Social Security Administration,[1] ) | |
| ) | |
| Defendant. ) | |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff Cathy M.[2] requests judicial review of the final decision of the Commissioner of the Social Security Administration (the "SSA"), denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act. For the following reasons, the Court **affirms** the decision of the Commissioner.

**I.     PROCEDURAL BACKGROUND**

On June 13, 2016, Cathy M. filed an application for DIB, alleging a disability onset date of December 1, 2015. (Filing No. 10-2 at 16.) Her application was initially denied on July 29, 2016, (Filing No. 10-4 at 2), and upon reconsideration on January 20, 2017, (Filing No. 10-4 at 7). Administrative Law Judge Douglas A. Walker (the "ALJ") conducted a hearing on February 27,

---

[1] According to Federal Rule of Civil Procedure 25(d), after the removal of Andrew M. Saul from his office as Commissioner of the SSA on July 9, 2021, Kilolo Kijakazi automatically became the Defendant in this case when she was named as the Acting Commissioner of the SSA.

[2] To protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

2019, at which Cathy M., represented by counsel, and a vocational expert ("VE"), appeared and testified. (Filing No. 10-2 at 36-70.) The ALJ issued a decision on March 25, 2019, concluding that Cathy M. was not entitled to receive benefits. (Filing No. 10-2 at 13-28.) The Appeals Council denied review on April 10, 2020. (Filing No. 10-2 at 2.) On June 15, 2020, Cathy M. timely filed this civil action, asking the Court pursuant to 42 U.S.C. § 405(g) to review the final decision of the Commissioner denying her benefits. (Filing No. 1.)

## II.     STANDARD OF REVIEW

"The Social Security Administration (SSA) provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151 (2019). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018). To be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled despite her medical condition and other factors. 20 C.F.R. § 404.1520(a)(4)(i). At step two, if the claimant does not have a "severe" impairment that also meets the durational requirement, she is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). At

step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on the Listing of Impairments, then her residual functional capacity will be assessed and used for the fourth and fifth steps. *See* 20 C.F.R. § 404.1520(a)(4)(iv)-(v). Residual functional capacity ("RFC") is the "maximum that a claimant can still do despite [her] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); Social Security Ruling ("SSR") 96-8p (S.S.A. July 2, 1996), 1996 WL 374184). At step four, if the claimant can perform her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). At the fifth and final step, it must be determined whether the claimant can perform any other work, given her RFC and considering her age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The claimant is not disabled if she can perform any other work in the relevant economy. *Id*.

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner for the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Stephens*, 888 F.3d at 327. For the purpose of judicial review, "substantial evidence" is such relevant "evidence that 'a reasonable mind might accept as adequate to support

a conclusion.'" *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154). "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens*, 888 F.3d at 327. Reviewing courts also "do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'" *Zoch*, 981 F.3d at 601 (quoting *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017)). The Court does "determine whether the ALJ built an 'accurate and logical bridge' between the evidence and the conclusion." *Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020) (quoting *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014)).

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. *Stephens*, 888 F.3d at 327. When an ALJ's decision does not apply the correct legal standard, a remand for further proceedings is usually the appropriate remedy. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021). Typically, a remand is also appropriate when the decision is not supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). "An award of benefits is appropriate only where all factual issues have been resolved and the 'record can yield but one supportable conclusion.'" *Id.* (quoting *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)).

### III.  FACTUAL BACKGROUND

When Cathy M. filed, she alleged that she could no longer work because of chronic, incurable disequilibrium, bipolar disorder, liver adenomas, a hysterectomy, and chronic migraines. (Filing No. 10-6 at 3.) She was 36 years old when her alleged disability began. (*See* Filing No. 10-5 at 2.) She has completed master's degrees in healthcare management and accounting. (Filing No. 10-2 at 39.) She has worked as an accounts receivable clerk, group coordinator in the health

4

insurance industry, IT associate, quality auditor, and research consultant.  (Filing No. 10-6 at 4.) The relevant evidence of record is amply set forth in the parties' briefs, as well as the ALJ's decision and need not be repeated here.  Specific facts relevant to the Court's disposition of this case are discussed below.

The ALJ followed the five-step sequential evaluation set forth by the SSA in 20 C.F.R. § 404.1520(a)(4) and concluded that Cathy M. was not disabled.  (Filing No. 10-2 at 28.)  At step one, the ALJ found that Cathy M. had not engaged in substantial gainful activity[3] since December 1, 2015, the alleged onset date.  (Filing No. 10-2 at 18.)  At step two, the ALJ found that Cathy M. had "the following severe impairments: migraines, vertiginous syndromes, liver adenoma, and other disorders of [the] vestibular system."  (Filing No. 10-2 at 18 (citations omitted).)  At step three, the ALJ found that Cathy M. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Filing No. 10-2 at 20.)  After step three but before step four, the ALJ concluded:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full range of sedentary work as defined in 20 CFR 404.1567(a).  She could perform work which requires up to 30 days to 3 months to learn techniques, acquire the information, and develop the facility for average performances in a specific job situation; she could lift or carry 10 pounds occasionally and 10 pounds frequently; she could stand and/or walk (with normal breaks) for a total of 2 hours in an 8-hour workday; she could sit (with normal breaks) for a total of 6 hours in an 8-hour workday; she could occasionally ascend and descend stairs; due to mild to moderate pain and medication side effects, she should avoid hazards in the workplace such as unprotected areas of moving machinery; heights; ramps; ladders; scaffolds; and on the ground, unprotected areas of holes and pits; she should be restricted to a "relatively clean" work environment (low levels of dusts, noxious odors, fumes, gas, while avoiding poor ventilation affecting the respiratory system, eyes, or skin); stable temperatures; moderate noise; occasional humidity and wetness;  she could perform each of the following postural activities occasionally: balancing, stooping, crouching, kneeling, and crawling but not the climbing of ropes or scaffolds, and

---

[3] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized).  20 C.F.R. § 404.1572(a).

>of ladders exceeding 6 feet; she has non-exertional limitations which frequently affect her ability to concentrate upon complex or detailed tasks, but she would remain capable of understanding, remembering, and carrying out the job instructions defined earlier; making work related judgments and decisions; responding appropriately to supervision, co-workers and work situations; and dealing with changes in a routine work setting; she should avoid stressful situations and can occasionally: work with co-workers in a team; work directly with the public; and work with supervisors or co-workers where interpersonal interaction or discussion is required; and she should work in an environment where she makes few decisions and uses little judgment.

(Filing No. 10-2 at 20-21.) At step four, the ALJ found, considering the VE's testimony and Cathy M.'s RFC, that she could not perform any of her past relevant work as a research assistant II, insurance clerk, and data entry clerk. (Filing No. 10-2 at 26.) At step five, considering Cathy M.'s age, education, work experience, and RFC, as well as the VE's testimony, the ALJ concluded that Cathy M. could have performed other work through the date of the decision with jobs existing in significant numbers in the national economy in representative occupations, such as a call-out operator, parimutuel ticket checker, and addresser. (Filing No. 10-2 at 27-28.)

## IV. DISCUSSION

Cathy M. makes four assertions. She asserts that the ALJ erroneously: (1) failed to include all the limitations caused by her severe and non-severe impairments, (Filing No. 12 at 21-23); (2) evaluated her subjective statements concerning her symptoms, (Filing No. 12 at 24-25); (3) rejected a medical opinion, (Filing No. 12 at 25-26); and (4) made a step five determination that was not supported by substantial evidence, (Filing No. 12 at 26-27).

### A. RFC and Subjective Symptom Evaluation

Though Cathy M. organizes her appeal arguments into challenges to the ALJ's: (1) RFC finding in one section; and (2) subjective symptom evaluation in another section, the specific arguments within each section sometimes fit better in the other section, and the inquiries are interrelated rather than distinct. (*See* Filing No. 12 at 21-25.) "The regulations require that an

6

ALJ's RFC be based on the entire case record, including the objective medical findings and the credibility of the claimant's subjective complaints." *Poppa v. Astrue*, 569 F.3d 1167, 1170-71 (10th Cir. 2009) (citations omitted); *see* 20 C.F.R. § 404.1529; 20 C.F.R. § 404.1545. "Since the purpose of the credibility evaluation is to help the ALJ assess a claimant's RFC, the ALJ's credibility and RFC determinations are inherently intertwined." *Poppa*, 569 F.3d at 1171; *see Outlaw v. Astrue*, 412 F. App'x 894, 897 (7th Cir. 2011) ("RFC determinations are inherently intertwined with matters of credibility, and we generally defer to an ALJ's credibility finding unless it is 'patently wrong.'") (quoting *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Accordingly, the Court will address the arguments within the first two sections of Cathy M.'s brief together.

The ALJ's summary of the medical evidence included statements that an "MRI of the brain was unremarkable," and a "videonystagmography (VNG) test[4] was normal." (Filing No. 10-2 at 22.) Cathy M. contends that "[t]hese assertions are not supported by the record." (Filing No. 12 at 24.) When the state agency consultant physician summarized the record evidence on January 20, 2017, she noted that "VNG was normal." (Filing No. 10-3 at 27.) On December 7, 2015, an inner ear specialist treating Cathy M. also commented that "[s]he's had a normal VNG." (Filing No. 10-7 at 34.) The specialist's impression was vestibular migraines, (Filing No. 10-7 at 34), which the ALJ also noted directly after the statements quoted above, (Filing No. 10-2 at 22). On June 18, 2015, VNG testing did not show "evidence of significant peripheral vestibular dysfunction," but there was "evidence of significant central vestibular dysfunction." (Filing No. 10-6 at 55-56; Filing No. 10-7 at 12.) Moreover, vestibular and oculomotor testing, performed on

---

[4] VNG testing uses small cameras to record eye movements and is one of many objective diagnostic tools that can be used to investigate balance problems. Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/balance-problems/diagnosis-treatment/drc-20350477 (last visited August 17, 2021).

February 2, 2016, showed "a substantial reduction in labyrinthine function on the left side (canal paresis of 57%), in line with the spontaneous nystagmus to the left and left onset in response to sinusoidal rotations." (Filing No. 10-9 at 9.) While the ALJ's summary of the evidence, pertaining to VNG testing in particular, is incomplete, the ALJ found a vestibular disorder to be one of Cathy M.'s severe impairments, and he reduced her RFC—further than the state agency consultants' assessments—to the sedentary exertional level with standing and walking limited to two hours in an eight-hour workday. (*See, e.g.*, Filing No. 10-3 at 26 (most recent consultant's assessment that Cathy M. was limited to a range of light exertional work with standing and walking four hours in a workday).) The ALJ explained that he was convinced by gait testing that showed that Cathy M.'s pattern was insecure and unsteady. (Filing No. 10-2 at 22.)

      Similarly, the MRI of Cathy M.'s brain was not completely unremarkable. An MRI taken January 12, 2016, showed a "few scattered small white matter hyperintense foci which are nonspecific. These are nonspecific findings that may be seen in the setting of migraine, small vessel ischemic changes, vasculitis, or other inflammatory etiologies." (Filing No. 10-7 at 82-83.) Cathy M.'s treating neurologist commented about the similar findings of a previous MRI that the lesions were probably the result of hypertension, smoking, or migraines, rather than an indication of multiple sclerosis. (Filing No. 10-7 at 6.) However, again, the ALJ credited that migraines were a severe impairment. Cathy M. has not developed how the objective testing results conflicted with her RFC. The VNG testing seems to suggest that Cathy M. was at least limited to the sedentary exertional level, but it's not apparent that the testing shows she was incapable of sit-down work. Even though Cathy M. was a daily smoker during the period at issue, (*see, e.g.*, Filing No. 10-7 at 122), the MRI might be diagnostic evidence of migraines, but it does not demonstrate the severity of Cathy M.'s impairment such that it directly correlated with any specific functional

limitations. *See, e.g.*, *Schmidt v. Barnhart*, 395 F.3d 737, 745-46 (7th Cir. 2005) (establishing a medical determinable impairment is only part of the claimant's burden, she must also demonstrate resulting functional limitations).

Cathy M. asserts that the ALJ failed to include a limitation that she would be off task during the workday because of her vertigo and migraines. (Filing No. 12 at 21.) She cites her own statements that she continued to have severe migraines four to seven days a week, made mistakes in the past while working with migraines, and usually needed to lie down when she had one. (Filing No. 12 at 21.) On July 21, 2015, Cathy M. reported to her neurologist that her vertigo was giving her "hallucinations," that were "minor," but "scary." (Filing No. 10-7 at 6.) During physical therapy, she reported "worsening of her visual and auditory hallucinations." (Filing No. 10-7 at 29.) On January 29, 2016, Cathy M. detailed her history to a pain management physician who administered a steroid nerve block injection for her migraines. (Filing No. 10-7 at 52-54.) She reported that she had more than a ten-year history of migraines that were resistant to multiple medications, increased with stress, occurred five to six days a week, and varied in intensity from no pain to a slight dull headache to severe ten out of ten pain. (Filing No. 10-7 at 52.) She reported that she also had a six-month history of "severe disequilibrium," not necessarily associated with a headache, that was "associated with changes in mental status and blurred vision." (Filing No. 10-7 at 52.)

When evaluating a claimant's subjective statements about the intensity and persistence of her symptoms, the ALJ must often, as here, make a credibility determination concerning the limiting effects of those symptoms. *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). Reviewing courts "may disturb the ALJ's credibility finding only if it is 'patently wrong.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir.

2015)). Reviewing courts examine whether a credibility determination was reasoned and supported; only when an ALJ's decision "lacks any explanation or support . . . will [a court] declare it to be 'patently wrong.'" *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). "Credibility determinations will not be overturned unless they are clearly incorrect. As long as the ALJ's decision is supported by substantial and convincing evidence, it deserves this court's deference." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citations omitted); *see Alvarado v. Colvin*, 836 F.3d 744, 749 (7th Cir. 2016) (A credibility determination "tied to evidence in the record" may not be disturbed as patently wrong.). If a fully favorable determination cannot be made based solely on the objective medical evidence, SSR 16-3p directs the ALJ to consider "all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms," including the regulatory factors relevant to a claimant's symptoms, such as daily activities, the location, duration, frequency, and intensity of pain or other symptoms, factors that precipitate and aggravate the symptoms, the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; and treatment, other than medication, an individual receives or has received for relief of pain or other symptoms. SSR 16-3p (S.S.A Oct. 25, 2017), 2017 WL 5180304, at *6-8; 20 C.F.R. § 404.1529(c)(3).

During the hearing, the ALJ asked Cathy M. "how long have you suffered from migraines?" (Filing No. 10-2 at 53.) The ALJ rephrased, "Fair to say it's several years before you stopped working?" (Filing No. 10-2 at 53.) Cathy M. testified, "Oh, yeah, it's been over ten years." (Filing No. 10-2 at 53.) The ALJ asked, "Have they changed at all since you've stopped working?" (Filing No. 10-2 at 53.) Cathy M. testified that "[i]n a way" they had, because injections "improved the frequency." (Filing No. 10-2 at 53-54.) The demonstrated ability to work with "long-standing complaints" is generally substantial evidence that a claimant is not disabled unless evidence shows

10

the impairment or impairments have worsened. *Castile v. Astrue*, 617 F.3d 923, 927-28 (7th Cir. 2010). For instance, on August 23, 2016, Cathy M. reported to her psychiatrist that her disability claim "was supposed to be mainly for the vertigo." (Filing No. 10-9 at 4.) Moreover, the ALJ partially credited Cathy M.'s subjective complaints. For example, consistent with the record showing that stress was a factor that triggered more severe migraines, the ALJ limited her to unskilled, low stress work with reduced interpersonal interactions, few decisions, and little use of judgment.

The ALJ also limited Cathy M. to no complex or detailed tasks—despite her considerable education and work experience—because he found that she would frequently have issues concentrating on such tasks.[5] In the context of the RFC, the ALJ did not find it necessary to also account for time that Cathy M. would be off task. The ALJ is required to credit the limitations established through subjective statements only to the extent he finds them credible. *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009).

Cathy M. presents several arguments that undermine the ALJ's consideration of her subjective statements. She argues that the ALJ ignored evidence regarding her activities of daily living that conflicted with his determination. (Filing No. 12 at 22-24.) The Seventh Circuit has "criticized ALJs for equating activities of daily living with an ability to work." *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (citations omitted). However, an ALJ is not only permitted but instructed to consider daily activities. *Id.* (citing 20 C.F.R. § 404.1529(c)(3)(i)). The ALJ may properly use activities of daily living to demonstrate that the claimant's testimony was undermined

---

[5] Cathy M. also contends that the ALJ failed to account for "any exacerbating effects" of her mental impairments in the RFC. (Filing No. 12 at 22.) However, Cathy M. does not assert the limitations that were supported by the effect of her mental impairments. An appellant must develop an alleged error with the ALJ's RFC analysis by identifying a specific limitation that was both supported and neglected. *Jozefyk v. Berryhill*, 923 F.3d 492, 497-98 (7th Cir. 2019). Cathy M. has not demonstrated that the ALJ's RFC finding was insufficient to account for her mental impairments.

about the extent of her exertional limitations. *Loveless*, 810 F.3d at 508; *Pepper v. Colvin,* 712 F.3d 351, 369 (7th Cir. 2013). The ALJ explained that "[w]ith regard to household chores, the claimant did not endorse any activities strongly inconsistent with sedentary level exertion." (Filing No. 10-2 at 22.) The statement is ambiguous. Perhaps, the ALJ meant that Cathy M.'s reported activities of daily living did not show she was capable of a greater exertional level than the ALJ found her to be when he assessed sedentary work, *i.e.* light exertional work that had been assessed by the consultants. Such a conclusion would not necessarily support an adverse credibility determination because it leaves open the question whether Cathy M.'s daily activities supported or conflicted with even greater limitations than the ALJ found. Cathy M. assumes that the ALJ was explaining that he found her activities of daily living to support that she could sustain sedentary exertional work. (*See* Filing No. 12 at 22.) Regardless, the ALJ clearly was aware that Cathy M. had reported symptoms that would conflict with her ability to sustain work. In the immediately following sentences, the ALJ explained that "[i]n pain questionnaires, the claimant reported severe migraines 4-7 days per week. During the hearing, the claimant reiterated these allegations." (Filing No. 10-2 at 22 (citations omitted).)

The potentially more substantive issue raised by Cathy M. is that the ALJ did not always confront the record evidence regarding her daily activities that supported her disabling allegations. *See, e.g.*, *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (An ALJ's analysis of daily activities can be flawed based on "[u]ncontested evidence [that was] not mentioned" about the difficulties the claimant has with performing those activities or the assistance she receives from others.) For instance, concerning the severity of Cathy M.'s mental impairments, the ALJ explained that he found that she had mild limitations with understanding, remembering, or applying information, rather than moderate limitations, "because the claimant endorsed

12

independent abilities to pay bills, count change, handle a savings account, and to balance a checkbook." (Filing No. 10-2 at 20 (citation omitted).) However, in the same form the ALJ cited that Cathy M. had provided to the SSA, she also reported that she lost track of time, often forgot, and frequently paid her bills late, which was a departure from her previous habits. (Filing No. 10-6 at 48-49.)

The ALJ also failed to confront a letter from an attorney for a licensed in-home healthcare provider who was responding to Cathy M.'s hearing representative's request for records of her "treatment for her cognitive disorder." (Filing No. 10-9 at 144-45.) The attorney explained that an evaluation and consultation had been arranged at the request of Cathy M.'s stepfather in March 2017, and care was provided in her home, twice a week, beginning in April 2017. (Filing No. 10-9 at 144.) The attorney also explained that Cathy M. "is often confused and has trouble making rational and reasonable decisions in routine matters of daily living." (Filing No. 10-9 at 144.) The attorney concluded that with the provider's assistance, Cathy M. was "able to live independently in her own home without being placed in a facility. She does need regular and close supervision to be certain she does not have an episode where she could become a danger to herself or others." (Filing No. 10-9 at 145.)

During the hearing, Cathy M.'s representative asked her what led to the decision to pursue a caregiver. (Filing No. 10-2 at 50.) She responded, "The inability to drive very much, to get through a whole grocery trip." (Filing No. 10-2 at 50.) The ALJ asked several follow-up questions that included the following exchange:

> [ALJ:] Was this at the insistence, or recommendation, or suggestion of a physician?
> 
> [Cathy M.:] Well, I talked to my doctor about it, but insurance won't pay for it, so --
> 
> [ALJ:] Well, actually they will under some circumstances.

13

> [Cathy M.:] Under some – I understand that, yeah but, for what I needed, they won't. I needed more help with the mobility and the getting places, and getting errands ran, and housekeeping, things like that. And, yeah, they won't pay for things like –
>
> [ALJ:] Okay, all right.

(Filing No. 10-2 at 51.)

Although the ALJ should have addressed the letter, the failure to do so is harmless. This is because there is no medical evidence that Cathy M. was diagnosed with a cognitive disorder. Furthermore, her testimony about her need for services was significantly different than what is described in the letter. There is no medical evidence corroborating that she had the inability to make rational, independent decisions. Based on the record, the Court does not conclude that the ALJ's subjective symptom evaluation was patently wrong because he failed to confront the evidence detailed above. A deficiency in the ALJ's decision does not invalidate the ALJ's credibility determination where the record shows that the ALJ considered other pertinent facts in making that determination. *See McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011) (upholding the ALJ's credibility determination despite finding "deficiencies" such that there was "some merit in two out of three of McKinzey's attacks" because the ALJ had cited to record evidence that undermined the limiting effect of the claimant's symptoms).

The ALJ explained that multiple, unremarkable mental status examinations supported his finding that Cathy M.'s mental impairments were not severe. (Filing No. 10-2 at 18-19.) The Seventh Circuit has explained "it is proper to read the ALJ's decision as a whole, and . . . it would be needless formality to have the ALJ repeat substantially similar factual analyses" throughout the decision. *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004). Normal mental status examination findings also undermine Cathy M.'s own allegations that she had significant memory problems, her frequent episodes of vertigo altered her mental status, and they resulted in

hallucinations, as well as the allegations in the letter that she was frequently confused and could not make rational decisions. On August 6, 2014, Cathy M. reported to her psychiatrist treating her bipolar disorder that she had increased stress from prolonged unemployment and the resulting need to move in with her parents. (Filing No. 10-7 at 86.) Cathy M. was well groomed, pleasant, cooperative, alert, oriented, with logical, coherent, and relevant thought processes, no delusions or hallucinations, and she had intact recent and remote memory, attention and concentration, and judgment. (Filing No. 10-7 at 88-89.) The same was true during visits on September 16, 2014, (Filing No. 10-7 at 92), October 16, 2014, (Filing No. 10-7 at 94-95), January 2, 2015, (Filing No. 10-7 at 97), May 20, 2015, (Filing No. 10-7 at 98-99), July 27, 2015, (Filing No. 10-7 at 102), August 31, 2015, (Filing No. 10-7 at 105-06), October 5, 2015, (Filing No. 10-7 at 109 (despite her also being "in some visible discomfort due to the vertigo"), November 17, 2015, (Filing No. 10-7 at 113), and February 25, 2016, (Filing No. 10-7 at 117).

On May 14, 2015, Cathy M. reported to another provider that her vertigo symptoms were getting worse every day to the point she felt like she was going to pass out, she had weakness in her limbs, and had "problems trying to keep a conversation due to weakness." (Filing No. 10-9 at 129.) On examination, she was noted to be awake and alert with an appropriate mood and affect. (Filing No. 10-9 at 130.) On January 11, 2016, at a gastroenterology consultation, she was noted to have normal judgment, insight, short and long-term memory, with proper orientation, and "no evidence of depression, anxiety or agitation." (Filing No. 10-7 at 188.) On August 23, 2016, Cathy M. returned to her psychiatrist and reported that despite ongoing headaches, debilitating vertigo, an enlarged liver, and narcolepsy, she had "[o]verall . . . been able to manage most days," she tolerated her medications "well," "they make a positive difference on her level of alertness," and they made a "marked difference" with her sleep. (Filing No. 10-9 at 4.) Her mental status

15

examination recorded that her mood was "stressed," but everything remained intact, including her memory, judgment, thought processes, appearance, affect, and attention and concentration. (Filing No. 10-9 at 5.) On February 20, 2017, during an emergency room visit when she was diagnosed with Cellulitis, her psychiatric examination was "normal" including affect and demeanor. (Filing No. 10-10 at 91.) On May 31, 2017, another treating provider noted her to be awake and alert with appropriate mood and affect. (Filing No. 10-9 at 85.) On October 12, 2017, Cathy M. reported to her primary care physician that her Depakote for bipolar disorder was stopped because of changes in her liver and "she was manic while she was trying different med[ications] to control her condition [but] she was . . . now on lithium with better control." (Filing No. 10-11 at 34.) The psychiatric examination was normal. (Filing No. 10-11 at 35.) On July 18, 2018, her psychiatric examination with her primary care provider was again normal. (Filing No. 10-11 at 19.) The complete lack of corroborating examination findings recorded across several providers including most notably Cathy M.'s treating psychiatrist—even in the context of contemporaneous and significant subjective complaints during those treatment visits—is substantial evidence in support of the ALJ's RFC finding and credibility determination. Accordingly, reversable error has not been demonstrated.

**B.     Medical Opinion**

Cathy M. also contends that the ALJ's reasons for giving little weight to the medical opinion of a consultative source, Catherine Cho, M.D. ("Dr. Cho"), were unsupported by substantial evidence. (Filing No. 12 at 25-26.)

When weighing a medical opinion, "the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's

opinion." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *see* 20 C.F.R. § 404.1527(c). So long as the ALJ "minimally articulates" his reasoning for discounting a medical opinion, the Court must uphold the determination. *Elder,* 529 F.3d at 415-16.

Though it is not noted in the record anywhere, Cathy M. emphasizes that Dr. Cho is the Director of Neuro-Ontology at New York Hospital. (Filing No. 12 at 25 (citing NYU Langone Health, https://nyulangone.org/doctors/1730151895/catherine-cho#credentials (last visited August 18, 2018).) On May 21, 2018, Dr. Cho filled out a form noting that she had seen Cathy M. as a "consultant only, will not continue to follow patient," and her diagnoses were "possible" persistent postural perceptual dizziness, as well as migraines associated with vertigo. (Filing No. 10-10 at 115.) Dr. Cho indicated that Cathy M. could not work any hours per day, could sit for four hours in a workday, walk for four hours in a workday, frequently would not be able to sustain attention and concentration to perform even simple tasks, and would have four or more absences per month. (Filing No. 10-10 at 115-16.) Dr. Cho explained that "[a]t the time," Cathy M. was "unsteady with 'brain fog' due to headaches and vestibular disorder" and she "has not been adequately managed and will not be able to concentrate on any task due to [her] vestibular disorder." (Filing No. 10-10 at 116.) Dr. Cho indicated that the restrictions were likely to change within the next 12 months. (Filing No. 10-10 at 116.)

The ALJ addressed the opinion. He described it as assessing "many extreme limitations" that would preclude all work. (Filing No. 10-2 at 24.) He explained:

> The undesigned gives little weight to these opinions because they are only partially consistent with the records. They are not well supported by any adequate explanations or any objective clinical signs, diagnostic studies or laboratory findings. Moreover, the length of treatment and frequency of examinations are also factors that negate the persuasiveness of these opinions.

(Filing No. 10-2 at 24.)

17

Cathy M. testified that she had seen Dr. Cho twice in one trip to New York in May 2018 (Filing No. 10-2 at 55), and Dr. Cho had prescribed her Valium for stress. (Filing No. 10-2 at 57-58.) However, the record does not include the evidence from Dr. Cho's consultation. Even assuming that Dr. Cho's opinion was based on an examination and a review of Cathy M.'s reported history and symptoms that was filtered through the specialist's experience and education, Dr. Cho indicated that the limitations were "likely" to change within a year with adequate treatment. The Seventh Circuit has explained that it "would be exceedingly illogical to credit a doctor's opinion because [she] is *more likely* to have a detailed and longitudinal view of the claimant's impairments when *in fact, there is no detail*[ed] *or longitudinal view*." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (emphasis in original). Dr. Cho did not support her assessment with reference to any testing or examination findings.

As explained above, the record does not include mental status examination findings that would support that Cathy M. was frequently unable to attend to or concentrate on any tasks. Moreover, Cathy M. had the burden to produce the evidence of the consultation to rebut the existing record. The Seventh Circuit has held that "[w]hen an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making [her] strongest case for benefits." *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987); *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017). Accordingly, the ALJ gave good reasons for rejecting Dr. Cho's opinion.

**C.    Step Five**

Cathy M. contends that the ALJ's step five determination is not supported by substantial evidence. (Filing No. 12 at 26.) She asserts that the ALJ found that one of the three occupational titles that she could perform was a call-out operator, but the VE testified that occupation would

not qualify if interpersonal interactions were limited to on an occasional basis. (Filing No. 12 at 26.) Cathy M. also contends that had the ALJ included additional limitations regarding her being off task or absent from work in her RFC, the VE's testimony established that those limitations would be disabling, but the ALJ did not explain why those additional limitations were not supported by the record. (Filing No. 12 at 27.)

Cathy M.'s argument concerning the call-out operator position is immaterial. The written decision does contain a couple of errors, including listing the call-out operator occupation even though that title would not qualify based on Cathy M.'s RFC. The ALJ also listed an incorrect occupational code for the parimutuel ticket checker title. *See Dictionary of Occupational Titles*, DICOT 219.587-010 (G.P.O.), 1991 WL 671989. However, the ALJ put to the VE a series of hypotheticals layering additional limitations on to the previous questions, including ultimately one such hypothetical question that comprised Cathy M.'s RFC limitations. (*See* Filing No. 10-2 at 64-67.) The VE testified that such an individual would be capable of working in representative occupations, such as an addresser, document preparer, and parimutuel ticket checker with a combined total of approximately 52,000 jobs in the nation. (*See* Filing No. 10-2 at 66-67.) The VE's testimony is substantial evidence in support of the ALJ's step five determination.

Cathy M.'s remaining arguments only develop that her alleged errors with the ALJ's RFC finding would be material if additional limitations were supported by the record. However, as explained in the first section of this Entry, the Court does not find reversable error demonstrated by Cathy M.'s substantive arguments concerning the ALJ's RFC finding.

## V.   CONCLUSION

"The standard for disability claims under the Social Security Act is stringent." *Williams-Overstreet v. Astrue*, 364 F. App'x 271, 274 (7th Cir. 2010). For the reasons stated above, the

Court finds no legal basis to reverse the ALJ's decision. The final decision of the Commissioner is **AFFIRMED**. Cathy M.'s appeal is **DISMISSED**.

    **SO ORDERED.**

Date: 9/8/2021

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jonelle L. Redelman
REDELMAN LAW LLC
jonelle@redelmanlaw.com

Catherine Seagle
SOCIAL SECURITY ADMINISTRATION
catherine.seagle@ssa.gov

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov

20